M3I1BUSA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BUSINESS CASUAL HOLDINGS, LLC,

                    Plaintiff,

          v.                           21 Civ. 3610 (JGK)

YOUTUBE, LLC, *et al.*,

                    Defendants.        Oral Argument (Remote)
------------------------------x
                                       March 18, 2022
                                       10:31 a.m.

Before:

                    HON. JOHN G. KOELTL,

                                       District Judge

                         APPEARANCES

CLOUDIGY LAW PLLC
     Attorneys for Plaintiff
BY:  ANTIGONE PEYTON, ESQ.

HOGAN DUFF, LLP
     Attorneys for Plaintiff
BY:  ANDERSON J. DUFF, ESQ.

WILSON SONSINI GOODRICH & ROSATI
     Attorneys for Defendants
BY:  JASON B. MOLLICK, ESQ.
     BRIAN M. WILLEN, ESQ.

ALSO PRESENT:  ALEX EDSON, CEO, Business Casual Holdings, LLC

M3I1BUSA

1              (Case called)

2              THE COURT:  Okay.  Who's on the phone for Business

3    Casual?

4              MS. PEYTON:  Good morning, your Honor.  This is

5    Antigone Peyton on behalf of the plaintiff Business Casual.  My

6    co-counsel Anderson Duff is also present.

7              THE COURT:  Okay.  Thank you.

8              And for YouTube?

9              MR. MOLLICK:  Good morning, your Honor.  This is Jason

10   Mollick on behalf of YouTube.  I'll be arguing today, but my

11   colleague Brian Willen is also on the call.

12             MR. WILLEN:  Good morning, your Honor.

13             THE COURT:  Okay.  Great.

14             This is a motion to dismiss.  I'm familiar with the

15   papers.  I'll listen to argument.  Mr. Mollick?

16             MR. MOLLICK:  Thank you, your Honor.

17             So the alleged infringements in this case were

18   contained, as you know, in three videos that were posted onto

19   YouTube's platform by the television network Russia Today.

20   I'll refer to them as RT.  Now notwithstanding some very

21   serious questions as to whether the copying was fair use, there

22   is no dispute—and it's in all the pleadings—that YouTube

23   removed all three videos shortly after receiving takedown

24   notices from the plaintiff.  So it begs the question: why is

25   YouTube being roped into a copyright dispute between Business

M3I1BUSA

1   Casual and RT if YouTube already removed all of the infringing

2   content?  The answer is that this case is not really about

3   infringing content; it's about noninfringing content.

4   Plaintiff's real goal here is to force YouTube to permanently

5   ban all RT videos from its platform, and that includes

6   thousands of other videos that have nothing to do with this

7   case or with the plaintiff.

8             Now plaintiff's hook --

9             THE COURT:  Can I just stop you.  Could I stop you for

10   a moment.  There has been a lot of publicity about RT in the

11   papers.  What's YouTube's position with respect to RT and its

12   use of YouTube?

13             MR. MOLLICK:  So let me just --

14             THE COURT:  It's not in the papers, but I want to

15   assure myself that there's nothing about this case that's moot.

16             MR. MOLLICK:  Right.  So I understand you're asking

17   about the situation with the Ukraine.  So I think YouTube

18   announced last week that it is blocking access to RT content on

19   YouTube globally for the time being.  I believe they've also

20   removed all ads, so ads do not run on any RT videos, although

21   they're now being removed for that, so that's moot.  Now

22   whether that's a permanent ban or only until the war ends, I

23   don't know.  Obviously the situation is evolving rapidly, and I

24   don't think anyone can predict what will happen.  So at this

25   point the access -- sorry.  Go ahead.

M3I1BUSA

1          THE COURT:  No.  You're very polite, and I appreciate

2     it.  That's one of the difficulties of doing an argument by

3     telephone.  But you're so good to stop when I begin to speak,

4     and I appreciate it.  And I certainly didn't want to interrupt

5     you.

6          But my question then—and perhaps this is more a

7     question for Business Casual than it is for YouTube—if in fact,

8     as YouTube says, this is all about simply blocking RT from the

9     use of YouTube and it's all about noninfringing content that

10    YouTube is running and it's no longer running RT at this time,

11    one wonders what this case is really about.  Go ahead.

12          MS. PEYTON:  Thank you, your Honor.  Antigone Peyton.

13    So this is not about noninfringing content, and it's not about

14    Business Casual thinking just out of thin air that RT should be

15    blocked.  This is about YouTube having a policy that it

16    repeatedly ignored and --

17          THE COURT:  Okay.  Okay.  Okay.  I got it.  I'll

18    return to you after I finish listening to Mr. Mollick.  So you

19    tell me it's not moot.

20          So go ahead, Mr. Mollick.

21          MR. MOLLICK:  Thank you, your Honor.

22          Just to respond quickly to that point, the very first

23    paragraph of their complaint, and also the very first paragraph

24    of their request for relief, makes very clear that the main

25    thing that they're interested in in this case is a ban on RT

M3I1BUSA

1   throughout the platform, but at the same time it's also

2   undisputed, again, as I mentioned at the top of the argument,

3   that YouTube has already removed all of the infringing content

4   from the platform.  So again, I do believe that it looks like

5   the relief that they're asking for is a ban on noninfringing

6   content.

7          Now their hook, as counsel just alluded to, is this

8   provision in the DMCA that says in order for YouTube to assert

9   the safe harbor defense, YouTube must implement what's called

10   the repeat infringer policy, and plaintiff seems to think this

11   requires YouTube to immediately, today, terminate RT

12   permanently, simply because plaintiff is accusing RT of

13   infringement, even though RT, as your Honor is well aware,

14   disputes the claim and is litigating it in the related case.

15   Now if this case proceeds past this motion, we will obviously

16   dispute that.  The short answer for now is that there's nothing

17   in the DMCA, in YouTube's policies, or in the case law that

18   requires any such a thing.  And the DMCA is ultimately

19   irrelevant to this particular motion.  The threshold issue in

20   this case is not whether YouTube benefits from the safe harbor.

21   That's not what the issue is.  The issue here is whether

22   plaintiff has a *prima facie* claim of infringement against

23   YouTube.  The DMCA, by its very plain terms, has absolutely no

24   bearing on that.  And here, the facts pleaded in the complaint,

25   which is very detailed, and in the exhibits, which themselves

M3I1BUSA

1   are also very detailed, shows that YouTube cannot be liable.

2              Now turning to the claims at issue, there are two

3   general types of claims.  There's direct infringement, such as

4   reproducing or displaying copyrighted content; and there's

5   secondary infringement, which is broken into two

6   parts—contributory liability and vicarious liability.  So

7   there's really four -- there's three, but I'll address them in

8   turn.

9              With respect to direct infringement, we have two

10  reasons we cited in our motion as to why they cannot state a

11  claim as a matter of law.  The first one is that there's no

12  dispute that all of the infringed content at issue was licensed

13  by the plaintiff to YouTube before the infringement ever began.

14  And it is black letter law that a licensor cannot sue a

15  licensee for copyright infringement.  Now in some cases there

16  might certainly be a claim for breach of contract, but that's

17  not this case, because here, the license broadly authorizes

18  YouTube to host and display all of plaintiff's YouTube content

19  on its platform.  Now that license, of course, does not absolve

20  RT of infringement, we're not suggesting that in any way, but

21  it does mean that plaintiff cannot sue YouTube because all of

22  plaintiff's claims boil down to YouTube hosting or displaying

23  content, which, again, is something that YouTube is licensed to

24  do.

25             Now another reason for dismissal is that direct

M3I1BUSA

1   infringement requires that the defendant has engaged in

2   deliberate, volitional conduct that actually caused the

3   infringement.  That's the key difference between direct and

4   secondary liability under copyright law.  And the case law is

5   very clear that creating software or simply creating software

6   that a third party might use to infringe on its own accord is

7   not volitional conduct on the part of the website itself.

8   Direct liability rests solely with the person who actually

9   issued the command or, as they say, presses the button to

10  infringe.

11              THE COURT:  Could I -- is YouTube correctly described

12  as an internet service provider, or is there another, better

13  technical term for describing YouTube?

14              MR. MOLLICK:  I think technically, internet service

15  provider is someone who provides access to the internet.

16  YouTube doesn't do that.  I think the better way to describe

17  YouTube is a user-generated content-hosting platform.  It

18  operates a website and also mobile applications that users can

19  post --

20              THE COURT:  I'm sorry.  User-generated?  Go ahead.

21              MR. MOLLICK:  I'm sorry, obviously, because of being

22  on the phone, a little bit difficult, so I'll -- yes, a

23  user-generated content-hosting platform.  It doesn't provide

24  access to the internet.  It has a platform that users, on their

25  own volition and accord, can post videos of their own choosing.

M3I1BUSA

1          And here, you see in the complaint, it's very clear,

2    the complaint attributes all of the infringing conduct to

3    someone else—RT.  The only thing that YouTube is accused of

4    doing is something that's perfectly lawful, which is providing

5    an automated platform that someone else used to copy and post

6    content of its own creation.  Now that might very well be

7    volitional infringing conduct by RT, but it's certainly not by

8    YouTube.

9          THE COURT:  What Second Circuit cases or other Court

10   of Appeals cases do you think are most supportive of that

11   concept?

12         MR. MOLLICK:  So I would point to the *Cartoon Network*

13   *v. CSC Holdings* case.

14         THE COURT:  Okay.  Yes, I know *Cartoon Network*.

15         MR. MOLLICK:  Right.  But also -- I apologize.

16         THE COURT:  No, no.  As I said, you're very good.  But

17   also?

18         MR. MOLLICK:  Yes.  But also, in addition to *Cartoon*

19   *Network*, there are plenty of district court cases that have

20   followed that, and have applied it in various contexts, and not

21   just in this circuit but in various other circuits.  In our

22   brief, we cite many of them.  For example, you have the *Wolk v.*

23   *Kodak* case.  That's a very good case that there's an artist who

24   sued a UGC site—user-generated content site—just like YouTube,

25   in part because you had third-party users of the site that

1  uploaded and stored images of the plaintiff's copyrighted works

2  on the defendant's site, and the court dismissed the direct

3  infringement claims at summary judgment because there was no

4  evidence of volitional conduct by the defendant, because the

5  court held that, you know, any reproduction, display, or

6  transmission of the images was simply an automated process with

7  no human intervention, at least by the defendant.  There might

8  certainly have been direct infringement by the users, but as to

9  the defendant who simply set up a website that users then used

10  to infringe, that did not create direct liability on the part

11  of the defendant in that case.

12          THE COURT:  One of the questions that I have is, I

13  understand the arguments that the DMCA doesn't create its own

14  cause of action.  It, rather, provides a safe harbor if someone

15  otherwise would be violating the copyright laws.  If the

16  alleged infringer then complies with the DMCA, there are safe

17  harbors under the DMCA.  But one theoretical question I have

18  is:  What's the need for the DMCA in view of all of the case

19  law that says internet service providers and other providers of

20  hosting platforms don't violate the Copyright Act by simply

21  existing and hosting people who otherwise put content on those

22  platforms?

23          MR. MOLLICK:  Sure.  So the DMCA provides a very

24  specific statutory procedure that, as you noted, results in a

25  safe harbor if the service provider is already found liable

M3I1BUSA

1    under existing principles of law.

2              THE COURT:  Right.

3              MR. MOLLICK:  So when I say the procedures, so there

4    are very specific procedures as to what the takedown notice

5    needs to say.  There's also a specific procedure as to --

6              THE COURT:  Right.  But my question is:  What's the

7    need for the DMCA if in fact the internet service provider or

8    other hosting platform doesn't otherwise violate the Copyright

9    Act?  So the DMCA is a statute that provides safe harbors,

10   providing that all of its requirements are met.  Why did

11   Congress think it was necessary to have the DMCA if there's no

12   underlying direct copyright infringement?  It's not like the

13   provision of the Communications Act that provides a safe harbor

14   for an internet service provider from liability for libel,

15   because the internet service provider could be liable as a

16   publisher.  Here, the thrust of your argument and the cases say

17   that if there's no volitional conduct on the part of the

18   internet service provider or the content-hosting platform,

19   there's no copyright liability because there's been no

20   volitional conduct.  So what's the need for the safe harbors in

21   the DMCA?

22             MR. MOLLICK:  Sure.  Well, one thing I could point to

23   is when the DMCA was enacted.  I believe it was 1998.  And that

24   comes only three years after the first case, and it was the

25   *Netcom* case in Northern District of California, which was 1995.

M3I1BUSA

1   That was really the first case that applied many of these

2   principles in the context specifically of online services.

3   Certainly contributory and vicarious liability existed before

4   that, but as applied to content-hosting platforms, it's 1995

5   when a court addressed it the first time.  I think Congress

6   just didn't know which way the law was going to develop because

7   it was just so undeveloped at the time.  So the DMCA comes very

8   shortly after these issues start arising.

9           And I would direct your Honor to a few things.  First

10  of all, the *CoStar* case, *CoStar v. LoopNet* in the Fourth

11  Circuit addressed actually this very same issue.  The plaintiff

12  in that case raised this same argument, and effectively said

13  that the DMCA, since it had been enacted, superseded any

14  preexisting requirements to establish a *prima facie* claim of

15  copyright infringement because as you suggested, the DMCA does

16  indeed overlap with many issues of what is or what is not a

17  *prima facie* claim.  And the court -- and this is in 2004, and

18  it's been cited many times after that.  The court said that

19  Congress intended the DMCA safe harbor to be a floor, not a

20  ceiling of protection.  And I'll read a passage directly from

21  the case, which really answers your question.  "The statute

22  specifically provides that despite a failure to meet the safe

23  harbor condition, an ISP is still entitled to all other

24  arguments under the law, including that conduct simply does not

25  constitute a *prima facie* case of infringement under the

M3I1BUSA

1    Copyright Act."

2            And also, you can see that Congress addressed this

3    issue in the statute itself.  So if you look at Section 512,

4    there's subsection (l).  Right there it says, in plain English,

5    it says that, "The failure of a service provider's conduct to

6    qualify for a limitation of liability under this section"—safe

7    harbor provision—"shall not bear adversely upon the

8    consideration of a defense by the service provider that the

9    service provider's conduct is not infringing under this title

10   or any other defense."  So I think that the DMCA is meant to

11   establish a very specific procedure about notice and takedown.

12   It also addresses other things, such as fraudulent takedown

13   notices, it addresses timing issues, it addresses subpoenas, it

14   addresses injunctions, so there's a lot more than just notice

15   and takedown.  But Congress is very, very clear, and the courts

16   have made it very clear, that this is not meant to displace

17   preexisting issues of direct and secondary infringement.

18           And the truth is that we have kind of a unique case

19   here in the sense that the plaintiff, to its credit, was

20   brutally honest in the complaint.  Most cases that are filed do

21   not provide the facts and the details sufficient to show on the

22   pleadings that the online service promptly removed the content.

23   Usually that's something that a defendant needs to show through

24   discovery.  Now it might happen very quickly and you could have

25   a quick summary judgment motion, and then usually, once you get

M3I1BUSA

1   to summary judgment, then you just -- the defendant uses the

2   DMCA because, well, you've already gone through discovery.  But

3   here we have a situation where the plaintiff, in great detail,

4   alleged when the videos were posted, when notices were sent to

5   YouTube, and when YouTube took them down, and also attached all

6   of the correspondence between the parties.  And what you can

7   see from all of that is that YouTube addressed these issues.

8   YouTube -- as soon as YouTube was notified about this conduct,

9   it investigated it, it considered the issues, and it removed

10  all of the videos.  And that not only defeats -- please.

11          THE COURT:  No.  Go ahead.  Thank you.

12          MR. MOLLICK:  Sorry.  And that not only defeats the

13  direct infringement claim, but it also addresses the secondary

14  infringement claims.  And again, like I said, that breaks into

15  two categories here—the contributory claim, the vicarious

16  claim.  A contributory claim requires that YouTube continued

17  hosting RT's infringing content after gaining knowledge of

18  specific instances of infringement, but again, the plaintiff

19  admits that YouTube did exactly the opposite.  As soon as

20  YouTube learned of the infringements and it investigated the

21  videos, it considered whether they were infringing and removed

22  them.  And again, the only thing that YouTube did not remove is

23  noninfringing content.

24          The same thing with respect to vicarious liability.

25  There's no such liability here because that claim requires that

M3I1BUSA

 1    YouTube profit from infringement while declining to exercise an

 2    ability to stop it.  And a keyword there is "declining."

 3    Basically vicarious liability essentially occurs when there's

 4    someone who is intimately involved in the infringing activity

 5    but turns a blind eye to it, even if they had the ability to

 6    stop it.  But again, that's the opposite of what YouTube did.

 7    And it's all in the pleadings.  As soon as YouTube found out

 8    about the infringement, it investigated and removed the videos.

 9            In fact -- and I'll point your Honor to something very

10    important in the complaint.  The complaint acknowledges that

11    YouTube did not even have the ability to stop these

12    infringements from happening until it received the takedown

13    notices.  You'll see in paragraph 44 of the complaint, they

14    admit that YouTube actually deploys tools designed to stop

15    copyright infringement, and they allege that RT used measures

16    to evade those tools.  So that is the opposite of vicarious

17    infringement on YouTube's part.  Far from turning a blind eye,

18    YouTube tries to stop infringement.  It didn't in this case

19    because you have a bad actor, an alleged bad actor who evaded

20    those measures, and once YouTube was informed of that, then at

21    that point YouTube has the ability to remove the content, and

22    that's exactly what it did.

23            So with that, your Honor, I'll stop there and answer

24    any questions or just yield to plaintiff.

25            THE COURT:  No, no.  You've answered my questions.

M3I1BUSA

1    Thank you.

2              Ms. Peyton.

3              MS. PEYTON:  Thank you, your Honor.

4              So let me start with the license defense, and then

5    I'll move to the issue around volitional conduct and the other

6    contributory and vicarious claims.

7              THE COURT:  Could I stop you at the outset on that.

8              MS. PEYTON:  Certainly.

9              THE COURT:  As I read your brief -- and you can

10   correct me if I'm wrong -- the brief is devoted to the

11   proposition that YouTube violated the DMCA.  It doesn't address

12   direct copyright infringement by YouTube under either of the

13   reasons that YouTube puts forward, either licensed or

14   volitional conduct.  The brief relies on the argument that

15   YouTube has failed to comply with the DMCA, therefore, YouTube

16   should be liable.  That assumes that a violation of the DMCA

17   would be independently actionable.

18             MS. PEYTON:  Your Honor, actually -- oh, I apologize.

19             THE COURT:  Address the issues of license and

20   volitional conduct.  Go ahead.  You're also polite, and I do

21   appreciate it.  It's very difficult to do these arguments by

22   telephone.  It sort of undercuts the spontaneity.  But you're

23   very polite, and I appreciate it.

24             MS. PEYTON:  Thank you, your Honor.

25             So we actually do talk about the infringement and

M3I1BUSA

1   license issue, albeit not in as great detail as the other

2   pieces relating to the DMCA issue.  It is not Business Casual's

3   position that failure to meet the safe harbor under the DMCA

4   gives rise to a new claim.  It is our position that YouTube is

5   free to follow its policies, or not, but if it doesn't follow

6   its repeat infringer policies, those safe harbor protections

7   under the DMCA are not available to YouTube.  Now what became

8   clear during the briefing in this argument is YouTube walked

9   away from its focus on its repeat infringer policies and its

10   position that --

11          THE COURT:  Could I stop you.  So I'll go over it

12   again, but could you just point me in your brief to where you

13   assert that, and discuss the cases on why YouTube is a direct

14   infringer because it had sufficient volitional conduct, and,

15   second, why YouTube is a direct infringer despite the existence

16   of the license.

17          MS. PEYTON:  Yes, your Honor.

18          So starting on page 21 of our brief, we address the

19   direct infringement issue and the position of Business Casual

20   that it adequately pled that issue in the complaint.  On the

21   following page, we then deal with the defendant's position,

22   their new position in their motion, that they are immunized by

23   their terms of service.  And then we go on to talk about the

24   vicarious and contributory infringement issues.

25          THE COURT:  Where do you discuss the requirement for

M3I1BUSA

1    volitional conduct and the cases that discuss what is direct

2    infringement by an internet service provider or a hosting

3    platform?

4             MS. PEYTON:  So, your Honor, on page 21, about halfway

5    down the page, after we identify the elements of a direct

6    infringement claim, the brief discusses cases in the Second

7    Circuit in which one's contribution to the creation of an

8    infringing copy is so great that it warrants holding a party

9    directly liable for an infringement even though the other party

10   has actually made the copy.  We then cite a series of cases,

11   your Honor.  We quote the *Cartoon Network* case, we quote

12   *Capitol Records*, and we quote the *Arista Records* case as well.

13   So these are -- I'm sorry.  Go ahead.

14            THE COURT:  But that's not this case, in the sense

15   that there's no contention that YouTube contributed content in

16   any way.  I mean, *Cartoon Network* leaves open the possibility

17   for direct infringement where a party is directly involved in

18   the creation of the content.  Here, there's no allegation that

19   YouTube was directly involved in the creation of the content.

20   It provided a platform.

21            MS. PEYTON:  Your Honor, it's not -- sorry.

22            THE COURT:  Are there any cases that support the

23   proposition that an internet service provider or other hosting

24   platform that does nothing with respect to the content of the

25   alleged copyrighted material has engaged in sufficient conduct

M3I1BUSA

1     to qualify as a direct copyright infringer?

2          MS. PEYTON:  Yes, your Honor.  There are situations

3     like the *Napster* case, where a third party provides a platform,

4     has awareness of infringing activities, and nonetheless fails

5     to shut those down.  And *Cox* is another example, which is in

6     the Fourth Circuit.  So it is not our position that YouTube sat

7     by and did nothing and quickly took things down.  What Business

8     Casual's position is, on direct infringement, is it provided

9     notice to YouTube of repeated infringing and bad behavior

10    activities by RT, and YouTube, particularly with the second

11    infringement complaint and the second takedown request, waited

12    several weeks to act on that.  And despite the numerous pieces

13    of information that Business Casual provided to it, it took 23

14    days.  It got three different notices on this particular

15    infringement allegation.  It received a letter to the board

16    outlining all of the bad behavior.  Excuse me.

17         THE COURT:  Once it receives a takedown notice,

18    doesn't it have to await the response?

19         MS. PEYTON:  Your Honor, it doesn't have to await the

20    response.  It can deactivate after it received that original

21    notice.  But actually, it received a response and had

22    information that led YouTube to understand that RT was

23    infringing, and it took 23 days to deal with that issue.  It

24    only received a response from RT after it took that information

25    down.  So that --

M3I1BUSA

1    THE COURT:  Okay.  There's no question that the

2    information was taken down.  So the issue for Business Casual

3    is that because YouTube took 23 days to take down the content,

4    that's the basis for the volitional infringement?

5    MS. PEYTON:  That's only one factor, your Honor.

6    YouTube violated its own copyright policies repeatedly—the

7    three strikes policy, the live stream policy, the partner

8    program policy.

9    THE COURT:  But the violation of its own policies

10   couldn't amount to a violation of the Copyright Act, could it?

11   MS. PEYTON:  It shows volitional conduct, your Honor.

12   It's just one of the pieces of facts here that support YouTube

13   not only turning a blind eye but affirmatively going against

14   the language of its policy in RT's favor to avoid applying its

15   own rules on policies that it wrote to RT.  It also had

16   additional information about RT's bad behavior on the

17   platform—again, because of Business Casual's notice to

18   YouTube—information about the fact that RT was engaging in

19   copyright protection circumvention measures—removal of the

20   watermark and putting RT's watermark on this content,

21   admissions by RT and its counsel that the only reasons why it

22   was submitting that second and third counter-notification is it

23   understood it had three strikes and if it didn't keep those

24   counter-notifications, it was going to be removed from the

25   platform.  So whenever YouTube was faced with a situation where

M3I1BUSA

| 1 | it had a policy provision that applied a particular requirement |
| 2 | to YouTube and restricted RT's access to the site or ability to |
| 3 | maintain its account, YouTube chose to ignore it.  It chose to |
| 4 | continue to monetize -- |
| 5 | THE COURT:  Okay.  Could I just stop you.  So at this |
| 6 | point there's no dispute that YouTube took down all of the |
| 7 | alleged infringing conduct by RT and it's no longer there, and |
| 8 | Business Casual says but they delayed 23 days to take it down. |
| 9 | So that's what this case is about.  They waited 23 days to |
| 10 | takedown the alleged infringing conduct.  The fact that before |
| 11 | they blocked RT, recently, they continued to host RT is not |
| 12 | alleged to be copyright infringement, right? |
| 13 | MS. PEYTON:  No, your Honor.  It is the fact that |
| 14 | they -- |
| 15 | THE COURT:  So that is copyright infringement, the |
| 16 | fact that they kept hosting RT after they took down all of the |
| 17 | alleged infringing conduct by RT against Business Casual?  What |
| 18 | is the violation of the Copyright Act that's involved in that? |
| 19 | MS. PEYTON:  No, your Honor.  That's not our position. |
| 20 | That they're continuing hosting of other content that was not |
| 21 | subject to the three takedown requests, that is not our |
| 22 | position.  We're not saying that -- |
| 23 | THE COURT:  Okay.  That's what I'm just trying to make |
| 24 | sure to clarify.  So there is no allegation that continuing to |
| 25 | host RT after the alleged infringing conduct contained in the |

M3I1BUSA

three separate programs, or three separate incidents, there's

no allegation that that is a violation of the Copyright Act.

So the question presented by the plaintiff is whether

continuing for 23 days without taking down the alleged

infringing conduct violated the Copyright Act.

MS. PEYTON:  That's correct, your Honor.  And all of

the information that YouTube had during that period of time and

the way that it engaged in activity around that time to

maintain RT and maintain its account --

THE COURT:  Okay.  Why is Business Casual bringing

this case against YouTube for 23 days?  It has its claims, and

I recently denied the motion to dismiss in Business Casual's

claim against RT.  But what interest does Business Casual have

in allegations of copyright infringement against YouTube for 23

days?

MS. PEYTON:  Your Honor, the interest is YouTube

repeatedly failed to follow its policies.

THE COURT:  Oh, I understand.  I got it.  I heard it

the first time, I heard it the second time.  But, you know, I

would have thought that companies make rational business

decisions.  Litigation is not cost free.  There are arguments,

which include the license as well as lack of volitional conduct

on the part of YouTube, and now that we've sufficiently defined

what the case is about—namely, an allegation that YouTube

didn't take the content down immediately but waited 23 days to

M3I1BUSA

1    sufficiently take down one of those videos—the question

2    naturally arises, why is this particular litigation going

3    forward while Business Casual has the other litigation directly

4    against RT?

5          MR. EDSON:  Your Honor, my name is Alex Edson.  I'm

6    the producer of the Business Casual documentary.  I have to

7    speak up about this.  And I am not an attorney, but I feel so

8    grateful to have this opportunity to speak to you.  I've been

9    waiting about 14 months to have this opportunity.  And I would

10   like to clarify some things that I don't think my attorney has

11   made clear.

12         The volitional conduct here is that YouTube made the

13   decision not to apply its "three strike" policy to RT's YouTube

14   channels after it received three valid DMCA takedown

15   notifications from Business Casual, and the issue here is

16   that -- you asked why Business Casual brought this case, your

17   Honor.  I would like to speak to that specifically.  I make

18   videos on YouTube's platform.  I'm one of the creators on

19   YouTube platform.  I love the YouTube platform.  Bringing this

20   case is one of the most difficult decisions I ever had to make

21   in my entire life.  I brought this case because I love making

22   videos on YouTube's platform, and the problem here is that

23   there's an infringer on YouTube's platform named RT, that has

24   been repeatedly fringing my videos for years, and the only

25   reason I knew about this is because my video editor in Morocco

M3I1BUSA

decided -- one day stumbled upon this video and sent it to me.

YouTube is correct when it says that RT took deliberate actions

to subvert YouTube's antiinfringement technology.  Where

YouTube is not being straight with the Court here is that

YouTube had actual knowledge of all of this and YouTube has

made the decision that despite all of this clearly nefarious

activity, YouTube has decided that it's still not going to

remove RT from its platform.

       Putting that aside for a moment, there are other

issues here that speak to YouTube's direct involvement in this

case.  You asked about the direct infringement claims.

YouTube's Moscow-based office has admitted that RT has three

YouTube strikes, and in fact the channel was actually

terminated for being a repeat infringer under YouTube's "three

strike" policy.  Again, it was only after the Kremlin publicly

demanded that YouTube reinstate this channel that RT was

actually reinstated.  So there's that as well.

       THE COURT:  Well --

       MR. EDSON:  I believe it's -- as to YouTube's direct

involvement, I just want to mention one other point.  YouTube

claims that it's just a platform, but the reality is, it's very

different in this case.  YouTube's senior executives have

actually reached out to Business Casual on behalf of RT to try

to resolve copyright issues for RT.  So that speaks to

something that's, well, not very platformlike, your Honor.

M3I1BUSA

1          THE COURT:  Well, thank you.  I've listened to you

2     correctly say that you're not the attorney, and usually I only

3     listen to the attorneys in the case, but I appreciate that you

4     feel strongly about it and so I've listened to you.

5          I should add a couple of other things, just so that

6     you understand.  It's very important for courts in this country

7     to decide cases according to the law, as best we can determine

8     it, based on the law and the facts.  And we apply those

9     principles of law as transparently as we can, based upon what's

10     before us.  So in this particular case, it's a motion to

11     dismiss based upon what the allegations in the complaint are,

12     according to the principles of law.  Now the principles of law

13     include whether there is direct copy right infringement based

14     upon the allegations in the complaint, which deal with three

15     separate incidents of RT posting its two videos on YouTube.

16     You say that there were other incidents.  Those are not

17     directly alleged in the complaint.  You also raise issues about

18     RT and RT's either influence or direct involvement with

19     YouTube.  I raised at the outset, because I have an obligation

20     to assure that you have subject matter jurisdiction -- one

21     aspect of subject matter jurisdiction is that the case is not

22     moot.  If the case is moot, I lack jurisdiction.  And so I

23     raised the issue of RT and YouTube's continuing to host RT.

24     YouTube says today, now, it is not continuing to host RT, but

25     they don't know what the future will be.  But that's the

M3I1BUSA

situation now.  And none of the parties have raised with me the

issue of mootness, but I raised it independently.  But I raise

that because some of the concerns that you raised with respect

to RT may have been alleviated by YouTube's decision not to

host RT any longer, at least for now.

So I just make those comments.  It's certainly

important for you to make all of your concerns known to your

lawyers so that the lawyers can make sure to make them known to

me.  But because you felt strongly, I wanted to make sure that

I listened to you and, to the extent that I could, attempt to

explain some of the principles about which I and I'm sure my

colleagues feel very strongly about—namely, our obligation to

follow the rules of law in individual cases, applying them to

the facts and the law as we find it in individual cases to the

best that we can.

Okay.  Ms. Peyton.

MS. PEYTON:  Yes, your Honor.

THE COURT:  I was going to listen to you for anything

else that you would like to tell me.

MS. PEYTON:  Thank you, your Honor.

THE COURT:  I interrupted you.

MS. PEYTON:  No worries. As you say, these are

awkward conversations on the phone.  But I appreciate the time.

So your Honor, I'll start with the last comment you

made about the platform and what YouTube has indicated is

M3I1BUSA

1  happening today.  I believe that counsel for YouTube said that

2  it has blocked access to the videos.  I did not hear YouTube

3  say that it has deleted the account or done something else to

4  physically kick RT off the platform.  If I misunderstand that,

5  I'm sure Mr. Mollick will tell us otherwise.

6       This is, as we all no doubt understand, because of

7  geopolitical issues that are happening, so our complaint is, as

8  we've talked about, around that period of time where there was

9  notice of repeated infringements and then YouTube failed to act

10  expeditiously and actually engaged in activities that

11  demonstrates hindrance of the effort to take infringing

12  material down.  So that is still a live issue.  There are still

13  damages associated with that activity today, and there are

14  still allegations in the complaint about the background

15  associated with that 23-day delay.  So while there is no other

16  case that is directly on point here, that's because this is an

17  extraordinary case.  I am not aware of any other case in any

18  other circuit where there is direct evidence of backchannel

19  communications between a party on a platform that is backed by

20  a foreign sovereign and a platform provider to avoid

21  application of their own policies.  And that is replete in the

22  evidence associated with the complaint.  So we ask that you

23  look at this complaint and the extraordinary circumstances

24  here.  Yes, there are many cases that talk about a mere period

25  of time or a platform can't be held liable for things of which

M3I1BUSA

1    it's not aware.  That's not this case, and that's not our

2    claim.  So we are not taking the position that all of that case

3    law is wrong; we are taking the position that this is an

4    extraordinary case.  There are significant facts here beyond

5    the time period to show a motivation and to show activity that

6    is occurring that caused that delay, and these are factors that

7    we ask the Court to consider when it looks at the complaint and

8    the direct infringement claim as pled at this very early stage,

9    and we believe that we have adequately pled the claim.  It's

10   clear on its face.  And it is not a defective claim.  So that

11   is Business Casual's position on direct infringement.

12            THE COURT:  What do you do with the license argument?

13            MS. PEYTON:  Yes, your Honor.  So on the license

14   argument, what's happening here is, YouTube is basically taking

15   the position that it has a license to do anything and

16   everything it wants with content that's uploaded to its

17   platform, that it has an unrestricted license to exploit

18   content creators' IP rights.  This is an end run around the

19   carefully crafted balance of rights and obligations and

20   protections under the DMCA.  We've already talked about that.

21   And under YouTube's theory of its license, the safe harbor is

22   irrelevant.  I've read a lot of cases about YouTube, your

23   Honor, and I haven't found one where the court agreed with the

24   license position that YouTube is taking today with respect to

25   its terms of service.

M3I1BUSA

1        THE COURT:  But is there any case rejecting it?

2        MS. PEYTON:  I have not seen a case rejecting it nor

3   approving of it, your Honor.  This is the first -- and perhaps

4   Mr. Mollick is aware of a case.  This is the first case I've

5   seen where YouTube is taking the position that it has, within

6   its terms of service, protection or immunity built in against

7   direct or indirect copyright infringement claims.

8        So but when you actually look at the language that

9   YouTube cites, that plain language doesn't support their

10  position.  The license is for YouTube to use and perform the

11  content in connection with the service in YouTube's business,

12  including promoting and redistributing its service.  That's not

13  what we're talking about here when we're talking about

14  copyright infringement claims.  Or the support of another party

15  in aiding and abetting another party in their infringement.  So

16  by the plain language of that license, your Honor, it does not

17  cover a copyright infringement case.

18       There is also surrounding information within that

19  license, so I will commend to your Honor, particularly with

20  respect to Exhibit B, which is the terms of service that I

21  believe YouTube is indicating applies to the Rockefeller video,

22  the second infringement allegation.  Section 5B talks about the

23  fact that a user on the platform can't download content or

24  copy, reproduce, broadcast, or display, or exploit content

25  without prior rights from YouTube or the licensor.  Section 6,

M3I1BUSA

1    which is the section that they cite, includes representations

2    that when you upload content to YouTube, you have the necessary

3    licenses, and YouTube in turn says it has the license to your

4    IP for "publication on the service."  There are other

5    provisions that also make this point, about protecting

6    copyright, you need licenses, things of that nature.  So when

7    you look at this license language and the terms of service in

8    context, and when you also look at it in context with the

9    information that's on the copyright cite that YouTube provides,

10   it all indicates that YouTube has a process for dealing with

11   notice and takedown.  It takes the public position that you

12   can't take third parties' information and appropriate it in

13   ways that violate their copyright protections.  And in fact, it

14   states that --

15          THE COURT:  But that would open the door to the suit

16   against RT.  It doesn't undercut the protection of the license

17   for YouTube.  For the --

18          MS. PEYTON:  Yes, it --

19          THE COURT:  I'm sorry.  Go ahead.

20          MS. PEYTON:  It certainly does open the door for the

21   suit against RT, your Honor.  But my point is, this is a terms

22   of service that talks about identifying and protecting

23   intellectual property rights, and when you look at the language

24   they provide, it talks about YouTube having a license to access

25   and provide your content on its platform.  And that's

M3I1BUSA

1    completely appropriate when you think about it, because if

2    you're going to upload content, YouTube's business model is, it

3    provides you the ability to monetize that content on their

4    platform by putting ads in your content, and having a revenue

5    split with YouTube based upon how many people watch your video.

6    So YouTube is taking the position here, though, to be clear,

7    that it actually has a license to do things that would

8    otherwise be infringing of your copyright, and it doesn't

9    matter what it does on the platform or how it might aid RT or

10   another party or how it might ignore the provisions of its

11   copyright policy.  It still has immunity from direct and

12   indirect copyright infringement claims.  That's not what its

13   policy says, and that's not an appropriate reading of the terms

14   of service or an appropriate way to look at YouTube's rights.

15            THE COURT:  Okay.  Anything else?

16            MS. PEYTON:  Your Honor, the only thing I will say

17   about the indirect infringement issues is we have a live claim

18   on direct infringement, so to the extent the Court is concerned

19   about the direct infringement claim here, we certainly would

20   take the position that the contributory and vicarious

21   infringement claims are adequately pled.  The same facts would

22   apply there in terms of YouTube's behavior, its actual and

23   red-flag knowledge of the direct infringement, and its material

24   and willful contribution, as well as its right and ability to

25   control or supervise those direct infringements, and given its

M3I1BUSA

1    activities as pled, it failed to exercise that right and

2    ability after receiving that actual knowledge, and directly

3    financially benefited from the period of time in which it left

4    RT's infringing material on the platform.

5            So with that, your Honor, unless you have additional

6    questions for me, we'll rest.  And I appreciate the comments.

7            THE COURT:  No, thank you.  You've been very helpful.

8    Thank you.

9            Mr. Mollick.

10           MR. MOLLICK:  Thank you, your Honor.  I will be

11   mindful of your time because we've been on for a while, but

12   there are a few things I want to address, and I'll try to

13   address them quickly and efficiently.

14           So first, with respect to volitional conduct, there

15   was a discussion about, well, are there any cases where

16   websites are found to have engaged in volitional conduct when

17   they're automated hosting platforms.  The only cases I see in

18   their brief that they cite for this proposition are completely

19   different, and they really demonstrate how YouTube is just --

20   this is just not that case.  So for example, if you look on

21   page 21 of their brief, they cite the *Capitol Records v. ReDigi*

22   case and they cite also *Arista Records v. Usenet* case.  These

23   are cases where there was evidence that the defendants, the

24   platforms, engaged in direct conduct to facilitate and to

25   induce their users to infringe.  So for example, in *ReDigi*, the

M3I1BUSA

```
1    defendant create a file-sharing service that was designed

2    solely for the purpose of distributing copyrighted content.

3    That software was programmed by the defendant to actually scan

4    for copyrighted content on the user's computer and then to

5    facilitate transferring copyrighted content.  So the court

6    found in that case that the defendant played an active role in

7    the infringing activity.  And the *Usenet* case, *Arista Records

8    v. Usenet*, also very similar.  The defendant created an online

9    bulletin board, and they took active steps to facilitate

10   infringement on their platform.  That was after Napster got

11   shut down.  We all remember Napster.  Well, Usenet created

12   modifications to its services and marketed itself to Napster

13   users as, hey, come over to our platform and trade infringing

14   content on our platform since Napster is gone.  That's not this

15   case.  The only thing that we have here is a platform that

16   passively hosted automated content that was uploaded and

17   created at the volition entirely of a third party.  No

18   allegation we played any role in encouraging that, inducing

19   that, or creating the content.

20            So that's with respect to volitional conduct.

21            THE COURT:  The plaintiff argues that the failure to

22   take the content down for 23 days and the existence of

23   conversations between YouTube and RT establish sufficient

24   involvement for direct infringement, sufficient involvement to

25   show volitional conduct.  And your response?
```

M3I1BUSA

1          MR. MOLLICK:  Sure.  So actually, that's going to be

2     the next topic, so thank you for that.

3          So first of all, let me point out, I'm not hearing any

4     argument at all about the first and the third videos.

5     Remember, we're dealing with three infringements here, three

6     videos, and for two of them, I'm not hearing any contention

7     whatsoever that YouTube did not act expeditiously.  I think one

8     of them, YouTube removed it within 72 hours; the other one,

9     YouTube removed after nine days.  I'll note that the one that

10    YouTube removed the quickest was the longest one, so I think

11    that tells you everything you need to know about their

12    allegations that YouTube is somehow in cahoots with RT.  If

13    they're in cahoots with RT, why did YouTube so quickly takedown

14    two of the three videos?

15         Now the only video that there's any dispute here is

16    with respect to the second video.  Now what's the second video?

17    The second video is 7 seconds of infringing content out of a

18    25-minute video.  And yes, that one took a bit longer to

19    remove.  And by the way, everything I'm saying here is staying

20    within the four corners of the complaint and the exhibits to

21    the complaint.  You'll see in the correspondence attached to

22    the complaint that YouTube did not sit on its hands and simply

23    wait.  I heard that word a lot the last few minutes.  I heard

24    "waited 23 days."  The correspondence attached to the complaint

25    shows that is simply not true.  YouTube actually responded to

M3I1BUSA

1   the takedown request after four days, and asked the plaintiff

2   to consider whether the content was fair use, because fair use

3   is something that plaintiffs must consider when sending

4   takedown notices.  Remember, this video is 7 seconds out of a

5   25-minute video.  So YouTube had very good reason to ask about

6   fair use.

7         Now the plaintiff replied with more information

8   establishing why it was not fair use.  YouTube considered it,

9   and then YouTube removed it about a week later.  Then the

10  plaintiff responded again and said, actually, the video is also

11  available at a different link, and then YouTube removed that

12  one, about nine or ten days later.  So in no instance did

13  YouTube sit on its hands or wait for 23 days.  The

14  correspondence shows back-and-forth engagement between the

15  parties, YouTube considering important issues—and issues that

16  are now being litigated and will now go into discovery in the

17  related case—and it took it down.  So YouTube does not become

18  itself a copyright infringer because it considered very

19  important issues.

20        The next thing I want to address is this issue with

21  the license, and I'll be brief on this, but I think that

22  counsel used the word "immunity."  It's not immunity.  It's a

23  license.  YouTube provides a platform that allows Business

24  Casual and others to upload their content free of charge.  The

25  exchange of consideration there is that you can post your

M3I1BUSA

1   content on YouTube free of charge.  By all means, go ahead.

2   But in return, you license the content to YouTube.  And all of

3   plaintiff's claims ultimately boil down to this idea that

4   YouTube is an infringer because YouTube displayed plaintiff's

5   content.  But YouTube is licensed to display plaintiff's

6   content.  And as your Honor noted, that in no way at all means

7   that RT is itself licensed to display plaintiff's content.

8   Plaintiff has a remedy, and that remedy is being pursued in

9   another litigation, but to also rope YouTube into the dispute

10  doesn't really make sense.

11          And I think that that also leads to my last point, and

12  it's something that your Honor hit on, and I think for a good

13  reason, which is:  Why are we here?  Why is Business Casual

14  bringing this case?  Because remember, the only video that was

15  not removed almost immediately was the second video.  So we're

16  talking here about 7 seconds' worth of content.  What are the

17  damages from 7 seconds' worth of infringement that came down

18  after a few weeks anyway?  Remember, you'll notice that the

19  videos were not registered until shortly before plaintiff filed

20  this lawsuit.  So that means that at the time the infringement

21  commenced of this video and the other videos, they were not

22  registered with the Copyright Office.  That's important,

23  because it means that the plaintiff is not eligible for

24  statutory damages and they're not eligible for attorney's fees.

25  They're also not eligible for injunctive relief because, well,

M3I1BUSA

the content is already down.  What else can the Court order

YouTube to do?  What plaintiff wants is they want an order

commanding YouTube to ban noninfringing, lawful content from

its platform, which is barred by the First Amendment.  There's

no basis, certainly under the Copyright Act, for a court to

order a private platform to remove noninfringing content.  So

ultimately, even if this case proceeds past this motion—which I

don't think it should, but let's just say hypothetically it

does—we're talking about 7 seconds out of a 25-minute RT video.

What are their damages from 7 seconds of an RT video?  I think

their complaint makes very clear what they want.  And again,

this is in the first paragraph in the complaint, and it's in

the first paragraph of their request for relief.  This lawsuit

is not about copyright infringement, it's not about damages;

it's about the plaintiff wanting to pressure YouTube, through

litigation, essentially, to take down content that ultimately

is lawful and noninfringing.  That is YouTube's discretion as a

private publisher.  That's not something that's proper for

plaintiff to force YouTube to do.  And I'll stop there.

          MS. PEYTON:  Your Honor, may I clean up two factual

issues here?

          THE COURT:  Sure.

          MS. PEYTON:  Thank you, your Honor.

          So counsel for YouTube took a position that there was

actually a response in a shorter period of time relating to

M3I1BUSA

1    that second infringement issue.  That's actually not correct.

2    The second video that he identified was not taken down from a

3    first link and then a second link.  What happened, evidently,

4    is, when the request came in for I believe a fifth time on a

5    status update on that second video, the response talked about

6    the third infringing video, the live stream.  So just to be

7    clear, your Honor, it was not taken down once, then taken down

8    again; rather, it was a full 23 days before it was actually

9    taken off the website.

10          MR. EDSON:  The other thing -- I'm sorry.  I just want

11   to clear up one thing as well.  And by the way, thank you for

12   providing me the opportunity to speak, your Honor, and I

13   appreciate -- I really appreciate it.

14          YouTube is completely incorrect on the time line.

15   YouTube sent Business Casual an email asking for additional

16   information.  Business Casual responded to that email the same

17   day that that additional information request was received.

18   YouTube did not take down the infringing video until 19 days

19   after that additional information was provided to YouTube.

20          YouTube also mentioned that the infringement in

21   question is only 7 seconds, allegedly.  It's actually 1 minute

22   and 28 seconds.

23          One other thing I want to point out of importance

24   here.  YouTube's own copyright center explicitly states that

25   YouTube routinely takes down videos all of the time for only

M3I1BUSA

1    using a few seconds of copyrighted material.  So it's not

2    exactly clear to Business Casual here why YouTube,

3    quote-unquote, wanted to take some additional time to make sure

4    Business Casual was considering fair use when YouTube's own

5    copyright center states we take down videos all the time for

6    only a few seconds.

7            That's all I wanted to say.  Thank you, your Honor.

8            THE COURT:  Okay.  As the movant, YouTube gets the

9    last word, if you want it.  Mr. Mollick?

10           MR. MOLLICK:  Sure, your Honor.  I'll just make one

11   very quick correction.

12           So I believe the plaintiff, Mr. Edson, said that

13   content is 1 minute -- or the second video was 1 minute and

14   something seconds long as opposed to 7 seconds.  You can look

15   right in the takedown.  It's attached to the complaint, Exhibit

16   E.  Page 1 of Exhibit E is the takedown notice identifying just

17   7 seconds' worth of content.  That's what's at issue there.

18   And then you see that YouTube responds four days later to ask

19   for information about fair use.  So it's all right there

20   attached to the complaint.  Now if plaintiff is saying that his

21   notice is mistaken, that it's actually 1 minute and change and

22   not 7 seconds, well, that does not impact YouTube because

23   YouTube can only be liable for what it's notified about.  So if

24   they're notified about 7 seconds, then that ultimately is what

25   this case is about.  And that raises the question:  Why are we

M3I1BUSA

1    here?  That's it.

2              THE COURT:  Okay.  All right.  Thank you, all.  I'll

3    take the motion under advisement.  I appreciated the briefs.  I

4    appreciated the arguments.  Thank you, all.  Great.  Bye now.

5              ALL PARTICIPANTS:  Thank you, your Honor.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25